RACHEL ABRAMS (Cal Bar No. 209316)
ADAM B. WOLF (Cal Bar No. 215914)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Laurie Spano, an individual, <br><br> Plaintiff, <br><br> v. <br><br> Lyft, Inc., a Delaware Corporation; and DOES 1 through 50, Inclusive, <br><br> Defendants. | Case No. 3:24- cv-00799-AMO <br><br> **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**</u>

Plaintiff, Laurie Spano, by her undersigned counsel, makes the following First Amended Complaint against Defendants Lyft, Inc., a Delaware Corporation ("Lyft"), and DOES 1 through 50 (collectively, "Lyft" or "Defendants"). Plaintiff pleads all claims in this Complaint in the broadest sense, under any laws that may apply under choice-of-law principles, including the laws of Texas, Plaintiff's state of residence and where Plaintiff was assaulted, or the laws of California, the state where Lyft maintains it headquarters and where most, if not all, of its wrongful conduct occurred. Plaintiff alleges as follows:

1

**NATURE OF ACTION**

2

1.    Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by a Lyft

3

driver with whom she had been paired through the Lyft App. Lyft is vicariously liable for the

4

injuries its driver inflicted on Plaintiff. In addition, through its officers, directors, and managing

5

agents, Lyft contributed to the attack on plaintiff by abandoning its duty of care toward its

6

passengers.

7

2.    Lyft is a transportation company headquartered in San Francisco, California and

8

is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware

9

10

that Lyft drivers were sexually assaulting and raping female passengers. Since 2015, sexual

11

predators driving for Lyft have continued to assault and rape Lyft's female passengers. For more

12

than eight years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon

13

Lyft passengers. Complaints to Lyft by female passengers who have been attacked by Lyft

14

drivers, combined with subsequent criminal investigations by law enforcement, clearly establish

15

that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft.

16

17

3.    Lyft's response to this sexual predator crisis amongst Lyft drivers has been

18

appallingly inadequate. Lyft continues to hire drivers without performing adequate background

19

checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most

20

importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures

21

designed to ensure the safety of its passengers. Consequently, Lyft passengers continue to be

22

victims of sexual assaults and rapes by Lyft drivers.

23

24

4.    As more fully set forth below, Plaintiff was raped by the Lyft driver she was led

25

to believe would give her a safe ride to her destination.

26

5.    The Lyft ride at issue was ordered for Plaintiff through the ride-sharing software

27

application owned and controlled by Lyft ("the Lyft App").

28

CASE NO. 3:24-cv-00799-AMO         2         PLAINTIFF'S FIRST AMENDED
COMPLAINT AND JURY DEMAND

6.     At all relevant times Lyft operated and controlled the Lyft App.

7.     The Lyft driver, while in the course and scope of his employment for Lyft and while otherwise working on behalf of Lyft, raped Plaintiff as set forth below.

8.     Plaintiff brings this civil action against Lyft to recover damages for the injuries she suffered as a result of being raped by the Lyft driver.

**PARTIES**

9.     Plaintiff L.S. is over the age of 18 and is a resident of Texas. The assault described below took place in the state of Texas.

10.     Defendant Lyft, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 185 Berry Street, Suite 400, San Francisco, California 94107.

11.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believe, and thereon alleges, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

12.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

13.     Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

14.     Plaintiff is further informed and believes, that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

15.     Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

16.     The Lyft driver who perpetrated the assault described herein ("Lyft Driver") was an agent, servant, and/or employee of Lyft.

17.     This Complaint refers to Defendant Lyft, Inc., and Does 1 through 50, inclusive, as Defendants.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20.     All corporate decision-making with respect to passenger safety issues is centered at Lyft's corporate headquarters in San Francisco. All executive decision making by Lyft regarding hiring policies, handling of complaints regarding drivers, driver termination policies, training of drivers, supervision of drivers, and standard operating procedures relating to drivers occurred in San Francisco.

21.     All executive decision making on the part of Lyft regarding its marketing campaigns and representations to passengers regarding its safety occurred in San Francisco.

22.     Lyft's contract with Lyft customers specifies that the agreement should be governed by California law.

## DIVISIONAL ASSIGNMENT

23.     Division is proper in this Court under Local Rules 3-2(c) and 3-5(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial division.

## RELEVANT FACTUAL BACKGROUND

***Lyft Completely Controls Its Transportation System and Has the Responsibility to Prevent Sexual Assaults Facilitated by that System.***

24.     Lyft is a transportation company. Passengers pay Lyft a fee in exchange for safe passage to their destination. Lyft provides an online and mobile application—the "Lyft App." The Lyft App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Lyft App. Drivers are notified of requested rides, which they can then accept and be compensated for by Lyft through the driver version of the Lyft App. Both versions of the app connect to the same website, Lyft.com, which is Lyft's website.

25.     Lyft is the designer and operator of its transportation system, and the designer, manufacturer, operator, and seller of the Lyft App that supports that system.

1    26.    Lyft alone decides who can access the Lyft App.

2    27.    For its passengers, Lyft decides who will be approved, and on what terms, to be a

3    Lyft account holder and thus be able to use the Lyft App. This includes promulgating and

4    enforcing rules regarding age restrictions, number of accounts per person, assignability and

5    transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

6    28.    For its drivers, Lyft alone decides which drivers it will recruit, who will receive

7    access to its transportation platform, and on what terms. It chooses whether and how to screen

8    those drivers. It alone decides what background checks to use, how far back to look, what prior

9    offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful

10    background checks (e.g., when a driver has recently moved to the jurisdiction where the

11    background check is conducted), whether to conduct in-person interviews, whether to conduct in-

12    person trainings or orientations, whether to have any in-person interactions with drivers, whether

13    to conduct drug and alcohol screenings, and whether to require training or have drivers take

14    exams.

15    29.    Lyft passengers and Lyft drivers are subject to Lyft's policies and procedures, of

16    which Lyft has ultimate authority to enforce.

17    30.    Lyft designs the way in which the entire transportation experience will work.

18    31.    Lyft selects which driver will be matched with which rider, and the basis on which

19    that match will occur.

20    32.    Lyft designs the ride pick-up experience. It sets the pick-up and drop-off location.

21    It decides what trade dress, markings, decals, devices, and in-App tools will be used for the driver

22    and rider to recognize one another.

23    33.    Lyft decides which aspects of the Lyft transportation experience (including

24    requesting a ride, requesting a ride for someone else, accepting a ride, locating a rider, locating a

driver, getting into a driver's vehicle, driving to a destination, making stops, changing destinations, adding multiple destinations, arriving at a destination, and disembarking) will be supported by buttons, controls, information, and other tools within the Lyft App, or by technology, devices, and services external to the Lyft App.

34.    When riders arrange transportation with the Lyft App, they input their destination and request a driver. The Lyft App then uses an algorithm to match the user with a nearby driver. Lyft drivers must be logged onto the Lyft App and indicate their ability to provide rides to be matched with a rider.

35.    Lyft has complete control over the amount of the fare, including additional fees and when to implement dynamic pricing.

36.    Lyft also controls all promotional offers, vouchers, and discounts and how they can be applied to a particular fare.

37.    If a rider chooses to cancel a trip, it must be canceled through the Lyft App and Lyft will determine if a cancellation fee will be charged and in what amount.

38.    If a rider chooses to modify a trip, such as adding additional stops, it must be modified through the Lyft App and Lyft will determine if additional fees will be charged and in what amount.

39.    Lyft collects GPS data and information on its drivers whenever they are using the Lyft App, and on riders from at least the time they request a ride until after they are dropped off.

40.    Lyft decides what information will be provided to the passenger about the Lyft driver and vice versa. In doing so, Lyft has decided that limited information should be provided. Passengers receive only a photo of the Lyft driver, along with the driver's first name, vehicle type and license plate number.

41.    Lyft does not provide drivers and riders with one another's contact information. Instead, all communications must be made through, or to, Lyft. Lyft decides what communications can be sent and when. After a ride, for example, a rider cannot request a refund directly from a driver, but only from Lyft.

42.    Lyft handles and decides the outcome of all complaints, issues, and grievances regarding the Lyft ride.

43.    When a Lyft driver or rider sends a support message through the Lyft App, or calls Lyft with a concern or complaint, Lyft responds using automated software programming and, where necessary, deploying a global customer support staff that follows Lyft's protocols to address the concern or complaint. Lyft facilitates, controls, tracks, and records these interactions via its internal customer service software.

44.    Neither drivers nor riders have access to the information in Lyft's internal customer service relations platform. Lyft has the ability to track and investigate driver and rider misconduct that occurs when drivers and riders use Lyft's transportation services, and over time it has increased its actual tracking of driver misconduct.

45.    A rider has no knowledge of a Lyft driver's prior bad actions, including whether the Lyft driver had prior complaints, is or was under investigation for misconduct, or had been subject to any suspension or other disciplinary action. A rider further has no control over which Lyft driver they will be paired with on any ride. Lyft alone controls the pairing and controls access to all information between the rider and the driver.

### *Lyft Controls Its Drivers and Their Work.*

46.    Lyft exercises extensive control and direction over its drivers in connection with the performance of the work that Lyft hires the drivers to perform.

47.    Lyft is a transportation company that provides transportation as its core business. Lyft drivers' work is thus squarely within and integral to the usual course of Lyft's business, as Lyft cannot provide transportation services without drivers.

48.    Driving for Lyft is not a specialized skill. Lyft drivers are largely nonprofessional, untrained individuals, who have no specialized background, education, training, or experience related to their work for Lyft. Lyft drivers are not customarily engaged in an independently established trade, occupation, or business.

49.    No preparation or up-front investment is required to work for Lyft. Any person with a vehicle and driver's license can decide to drive for Lyft and apply to do so at any time.

50.    Lyft's investments into its transportation company greatly outweigh the investments by the Lyft driver. Lyft has invested hundreds of millions of dollars into its transportation network and transportation systems. Additionally, Lyft maintains brick and mortar facilities around the world where it employs thousands of individuals to interact with Lyft drivers and riders.

51.    No specialized tools or equipment are required to drive for Lyft. Rather, Lyft drivers need only have a personal vehicle that is subject to approval by Lyft.

52.    Lyft provides its approved Lyft drivers with access to Lyft-branded decals and signage for use in their vehicles while they maintain active Lyft accounts.[1]

53.    Lyft requires drivers to comply with a list of "Community Guidelines" that Lyft promulgates.[2] In reality, Lyft drivers operate in an environment and under such restrictions (or lack thereof) as Lyft unilaterally decides. Violation of these "Guidelines" can be grounds for termination.

---

[1] *See* https://help.lyft.com/hc/en-us/driver/articles/115013082088-New-driver-welcome-kit
[2] *See* https://www.lyft.com/safety/community-guidelines

54.     Lyft drivers must use the Lyft App to access, accept, and complete Lyft rides.

55.     Lyft sets the minimum amount of work that a Lyft driver must complete.

56.     Lyft monitors how long a Lyft driver has been driving and disables the driver's App for six hours after driving time reaches 12 hours.[3]

57.     Lyft retains the ability to deactivate a driver's App without notice or investigation.

58.     Lyft has exclusive access to the customer list (riders), customer locations, and the customer's destination requests.

59.     Lyft designates the approved geographical region for the Lyft driver. If the Lyft driver wants to receive rides outside of that area, they must submit a request to Lyft.

60.     Lyft assigns all drivers' work through its driver/rider matching algorithm. The Lyft driver cannot choose which rider to be matched with, nor can riders choose their drivers.

61.     Lyft has exclusive control of the customer volume. Lyft decides who, when, where, and how many ride requests to assign to each driver.

62.     The Lyft driver has no control over the value of the services provided. Lyft unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares (algorithmic increases in fares to reflect supply of drivers and demand of riders).

63.     Lyft dictates what forms of payment are accepted and forbids Lyft drivers from requesting or accepting cash for fares.

64.     Lyft forbids drivers from negotiating a different fare with riders for any trip on its system.

65.     Lyft tracks Lyft driver locations and suggests certain routes for trips. Lyft has the right to adjust a fare if a driver takes a different route.

_____

[3] *See* https://help.lyft.com/hc/e/all/articles/115012926787-Taking-breaks-and-time-limits-in-driver-mode

66.     Lyft alone decides what percentage of each fare to keep and what percentage to pay to the driver or, in some cases, whether to share certain fares with the driver at all.

67.     Lyft processes all payments and distribution of payments to the driver.

68.     To begin work, a driver logs into the Lyft App and then waits for Lyft to select a customer.

69.     Lyft uses real-time GPS monitoring to track the driver at all times while logged into the app.

70.     Lyft unilaterally decides when and where to send the driver trip assignments for customers requesting rides.

71.     Lyft monitors the driver's use of the Lyft App, and the rate of accepted, declined, and cancelled assignments, which Lyft can use to deactivate or suspend the driver.

72.     Lyft uses its technology to monitor the driver's speed and location; whether the driver is arriving within Lyft's estimated time of arrival; whether the driver is taking the rider "off route;" and whether the driver is operating his vehicle in a way Lyft deems acceptable.

73.     Lyft advertises that it offers a service called Smart Trip Check-In. In Lyft's words, "We monitor rides for unusual activity, like long stops or route deviations. If we notice anything off about your ride, we'll contact you to see if you need help. You can also schedule a check-in to confirm you got to your destination safely."

74.     Lyft advertises: "Safety team members are always standing by, ready to help via phone or chat."

75.     If a Lyft driver deviates from Lyft's suggested route, Lyft notifies the driver that they are not following the suggested route.

76.     Lyft controls the driver's actions by threatening to deactivate or suspend drivers if they do not maintain a certain star rating. Lyft unilaterally sets the star rating and constantly

prompts Lyft drivers to keep a high star rating or to improve the star rating if the driver is not performing to Lyft's standards.

77.    Lyft unilaterally sets the percentage of trips a driver can cancel. A "cancelation" occurs if the driver accepts the trip and then cancels the trip before the rider enters the vehicle. Lyft can deactivate a driver if the driver cancels too many trips.

### The Risk of Sexual Assault Was a Known Risk of Lyft's Business Model, and Lyft Had a duty to Address and Prevent this Harm.

78.    Transportation companies have a particular duty to keep passengers safe. By offering transportation services, such companies represent that they can be trusted to safely transport someone from one place to another.

79.    Thus, transportation companies must consider and address how passengers could be harmed in connection with the pick-up, transport, or drop-off process.

80.    When so-called "peer-to-peer" transportation was first introduced, this innovation foreseeably brought an elevated risk of sexual assault. Lyft's business model involved aggressively recruiting large numbers of random people who have a driver's license and a car, learning little about them, and requiring of them virtually no up-front investment. Lyft then convinced riders to trust that Lyft's business model was safe, that potential dangers were vetted, and that riders could entrust their safety to Lyft drivers. All this, despite the fact that Lyft drivers would have the power to control the freedom of movement of their passengers, who are isolated from potential witnesses, aid, and escape while in the Lyft drivers' vehicles.

81.    A valid driver's license is not even a minimal guarantee of a safe driver. Almost anyone can get and maintain a driver's license. Loss of a license is not a typical consequence of committing a crime, including sexual assault, domestic violence, or violent behavior. No one has to undergo any type of background check to get a driver's license.

82.    When Lyft opened its business to non-professional drivers, it was well known that situational and environmental factors contributed to sexual violence, and that sexual predators take advantage of situational vulnerability to perpetrate sexual violence.

83.    An elevated risk of sexual assault was always a foreseeable consequence of Lyft's business model, and Lyft knew or should have known this.

84.    Yet Lyft's model gave predatory drivers incentives (rather than deterrents) to target passengers as victims. The drive-when-you-want approach provided ideal opportunities for bad actors to sign onto the App late at night and drive in the area of late-night venues and clubs. Lyft easily could have, but failed to, address this issue using its algorithms.

85.    Reasonably careful and responsible businesses, when they innovate in ways that foreseeably introduce new or heightened public safety risks, consider and address those risks thoughtfully and devote adequate resources to study those risks and prevent harm. Lyft took none of these measures.

### *Lyft's Safety Measures are Grossly Inadequate.*

86.    Lyft's public representations state that "safety is a top priority" and "it is our goal to make every ride safe, comfortable and reliable." Sadly, Lyft's priority is not passenger safety. Profits are Lyft's priority. As a result, Plaintiff and other female passengers continue to be attacked by sexual predators driving for Lyft.

87.    Lyft had many tools at its disposal for reducing riders' risk of sexual assault, including: rigorous screening of drivers; prompt termination of drivers who engage in sexual misconduct; in-App tools such as panic buttons with prompt responses from Lyft and coordination with law enforcement; surveillance for unusual conduct during rides; training drivers and communicating to them that there will be strict penalties and accountability; diligently investigating allegations of sexual assault; communicating to riders that because Lyft's drivers

are not professionals and are not well known to Lyft, Lyft is unsafe and unsuitable for use by solo intoxicated riders; immediate termination of drivers who violate policies, mandatory installation of cameras that could not be deactivated during trips, among others.

88.    Lyft, as a technologically advanced company that tracks drivers for its own benefit, had the ability to require drivers to use inward-facing cameras that would record whenever a passenger was in the vehicle. Lyft had the ability to design these cameras to remain operational until both the driver and rider confirmed that the trip was over. Lyft knew that requiring such cameras would be a powerful deterrent to sexual assault. However, Lyft had no interest in requiring drivers to have cameras or other physical equipment that might slow its rapid onboarding of new drivers or discourage some drivers from applying. It also worried that requiring cameras might be construed as evidence of "control" that would establish an employer-employee relationship between Lyft and its drivers. Therefore, it did not require cameras.

89.    It is well established that sexual assault is preventable through environmental modifications that deter sexual violence. If Lyft had been reasonably thoughtful and careful in the rollout of its transportation product, it could have prevented the sexual misconduct that harmed Plaintiff.

90.    Lyft also made it far too easy to become a driver on its platform. Lyft understood that if it wanted to compete in the rideshare market, it would need to eliminate barriers that could limit the size of its fleet of drivers.

91.    Lyft knew that the background checks, interviews, in-person interactions, checking of references, drug and alcohol testing, training, tests, and other requirements for becoming a licensed taxi driver existed to protect passengers from unqualified or dangerous drivers, including those who might abuse their position to commit sexual assaults.

92.     To increase and maintain its supply of drivers, however, Lyft decided not to implement reasonable measures to protect passengers from dangerous drivers. This decision foreseeably came at the expense of the safety of Lyft passengers, especially female riders.

93.     Even today, the hiring of Lyft drivers occurs without any real screening. Almost all online applicants who meet the minimum requirements will become Lyft drivers. Potential drivers merely fill out a form online. There is no interview, either in person or through online platforms such as Skype or Zoom. There is no adequate background check and no biometric fingerprinting.

94.     Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process. Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check.

95.     Neither Lyft nor the third-party vendors it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically just a few days.

96.     The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.

97.     For example, most prospective taxi drivers are required by taxicab companies to undergo criminal background checks that require the driver to submit fingerprints through a technology called "Live Scan." The fingerprint images are used to automatically search against all other fingerprint images in government criminal record databases, including databases maintained by state law enforcement and the Federal Bureau of Investigation (FBI). The FBI's database includes criminal record information from all 50 states, including sex offender registries. If a person has a criminal history anywhere in the U.S., it will register as a match.

98.     Fingerprints are not only a highly accurate way to confirm an individual's identity, but they are also universally used among state and federal government agencies. This allows for the highest levels of information sharing among all relevant agencies – an element that is lacking when fingerprints are not used to verify identities.

99.     Because of the unique identifying characteristics of fingerprints, the Live Scan process provides assurance that the person whose criminal history has been run is, in fact, the applicant. This would ensure that a convicted rapist or sexual predator could not use a false identification to become a Lyft driver.

100.    Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These name-based criminal background checks are performed on publicly available databases and records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, there is no true national search performed, making these searches incomplete, limited and inaccurate.

101.    Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Likewise, because names, addresses and birthdays are not unique, the likelihood of

false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes her name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

102.    Lyft has refused to adopt fingerprint-based biometric checks and has in fact spent millions of dollars lobbying against local regulations requiring these checks.

103.    Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. That is another reason why Lyft management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.

104.    Once an applicant becomes a Lyft driver, Lyft also fails to utilize its own technology or other readily available methods, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. Lyft does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving.

105.    Lyft also requires little or no upfront investment from its drivers. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App. In fact, it is no longer a requirement that a driver even have a vehicle. Lyft partners with car rental companies to make rental cars available to prospective drivers.

106.    Lyft also provides its drivers with inadequate training regarding sexual assault, sexual relations, sexually inappropriate behavior, sensitivity, and customer relations. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that

they have to "hot" young women. Notwithstanding Lyft's history of hiring sexual predators who have assaulted Lyft passengers, and notwithstanding the obvious and open subculture of Lyft drivers who harbor a sexual motivation for driving young female passengers, Lyft does nothing to warn its female passengers about this very serious and real danger.

107.    Lyft instead lobbies state and local governments to limit what is required with respect to driver background checks. Lyft also lobbies local government entities to continue allowing Lyft to perform its own background checks of its driver applicants, rather than municipalities performing the more stringent and reliable screening they conduct for traditional taxi drivers.

108.    Lyft has successfully persuaded lawmakers in several states to keep background-check requirements for its drivers limited.

109.    As a direct result of Lyft's lobbying efforts, those entities largely self-enforce hiring standards for their drivers. In cities where municipalities perform the screening, such as in Houston, Texas and Seattle Washington, hundreds of driver applicants Lyft approved are ultimately rejected by the municipality.

*Lyft's Failure to Monitor Rides*

110.    Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of the sexual assaults by Lyft drivers:

a. Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;

1

2

    b.  Maintain a surveillance camera and require its continuing operation during all

3

        rides;

4

    c.   Save camera footage and make it accessible for up to 72 hours after each ride;

5

    d.  Inform drivers that if they turn off the surveillance system during a Lyft ride,

6

        they will never drive for Lyft again;

7

    e.  Inform drivers that they may not leave the car and accompany a passenger to

8

        their home or to any other location outside the vehicle, other than to provide

9

        temporary and time-limited assistance to a passenger;

10

11

    f.  Modify the functionality of the Lyft app so that Lyft can determine immediately

12

        if a driver deviates from these protocols;

13

    g.  Monitor rides and implement a system whereby passengers are required to

14

        confirm their intention to terminate a ride before reaching their destination; and

15

    h.  Monitor rides and implement a system whereby passengers are required to

16

        confirm their intention to change their destination or their intention to deviate

17

        significantly from the assigned route.

18

    111.    The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft.

19

20

Prior to Plaintiff's assault, Lyft knew that a consequence of its business model has been exposing

21

women, who rely on Lyft for a safe ride home, to drivers that may take advantage of their

22

vulnerable position. Despite holding itself out to the public as being engaged in the safe

23

transportation of its passengers from place to place for compensation, Lyft has failed to take

24

reasonable precautions to attempt to prevent harm to its passengers.

25

26

27

28

112.    At the time of the actions alleged in this complaint, Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take reasonable action to protect its passengers from these assaults and violations.

### Lyft's Misrepresentations as to Safety

113.    In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.

114.    Lyft actively markets itself as a safe company that provides safe rides. Both before 2015 and after, Lyft actively and aggressively marketed the supposed safety of its transportation services. These efforts continue to this day, and include email messages sent to every Lyft customer, including Plaintiff.

115.    Lyft markets its ride hailing service to female riders as a safer alternative to traditional taxis. Over the years, Lyft has launched marketing campaigns specifically marketing its transportation services to, among others, young women too intoxicated to drive.

116.    Lyft actively and publicly markets its transportation services to be safe and reliable services.

117.    Lyft actively and publicly markets its transportation services to be safe and reliable during late-night hours.

118.    Lyft has cultivated an image among its customers of safety and superiority to public transportation and traditional taxis. Because of aggressive marketing, most Lyft customers are generally unaware of the real risks associated with Lyft rides and continue to believe a ride with Lyft is a safer and better alternative.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

119.    Riders, including Plaintiff, reasonably rely on Lyft's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Lyft as a result of this reliance.

120.    The safe image that Lyft aggressively cultivates suggests to customers, including Plaintiff, that riding while intoxicated with Lyft is safe. Lyft does not inform riders, like Plaintiff, that hailing a ride after drinking puts riders in peril from the drivers themselves. By marketing heavily to young women who have been drinking, and promising safe rides, Lyft puts riders in danger.

121.    Lyft knew its representations and promises about rider safety were false and misleading yet continued to allow riders to believe in the truth of these representations and promises and continued to profit from riders' reliance on those representations and promises.

122.    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city."  In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by their Lyft drivers.

123.    Further, Lyft refused for many years to report any statistics about sexual harassment or sexual assault by its drivers. Despite Lyft's knowledge that these incidents

regularly occurred among its drivers, it was not until October 2021 that Lyft finally released a report on the safety of its platform.

124.    In its "Community Safety Report," Lyft announced statistics on the occurrence of attacks and motor vehicle accidents to drivers and riders using the Lyft App. The Report noted 10 deaths, over 4,100 sexual assaults, and 360 rapes between 2017-2019. In a clear indication that Lyft's safety policies and procedures were not working, the Report revealed **a** *65% increase in sexual assault* in 2019.

125.    Lyft's Report was woefully incomplete, however, as it omitted statistics of non-fatal physical assault (despite a nationwide epidemic of car-jackings) and failed to break down the incidents of assault by whether the assailant was a rider or a driver.

126.    Lyft has effectively hidden its Safety Report from visitors to its website, which only touts the inadequate safety measures Lyft purports to have in place. Even more telling is Lyft's failure to update its reporting to include statistics after 2019. The fact is, Lyft is more interested in protecting its bottom line than protecting its drivers and riders.

127.    Lyft's most recent Annual Report (2022) makes this patently clear. In disclosing "Risks Related to Operational Factors," Lyft essentially admits why it has chosen to put profits over safety:[4]

> ***Illegal, improper or otherwise inappropriate activity of users, whether or not occurring while utilizing our platform, has and could continue to expose us to liability and harm our business, brand, financial condition and results of operations.***
>
> . . . .
>
> At the same time, ***if the measures we have taken*** to guard against these illegal, improper or otherwise inappropriate activities . . . ***are too restrictive*** and inadvertently prevent qualified drivers and riders otherwise in good standing from

---

[4] Lyft 2022 Annual Report, p. 24 (available at: https://s27.q4cdn.com/263799617/files/doc_financials/2022/ar/FY22-Annual-Report-10-K-Final-with-D-O-Page-2.pdf). (Emphasis added).

using our offerings, or if we are unable to implement and communicate these measures fairly and transparently or are perceived to have failed to do so, **the growth and retention of the number of qualified drivers and riders on our platform and their utilization of our platform could be negatively impacted**.

. . . .

Further, **any negative publicity related to the foregoing**, whether such incident occurred on our platform, on our competitors' platforms, or on any ridesharing platform, **could adversely affect our reputation and brand or public perception** of the ridesharing industry as a whole, which could negatively affect demand for platforms like ours, and potentially lead to increased regulatory or litigation exposure. **Any of the foregoing risks could harm our business, financial condition and results of operations**.

128.   These business-first concerns explain why Lyft downplays and fails to report the sobering statistics of violence on its platform, and why Lyft has intentionally and systematically failed to take more aggressive measures to protect its drivers and riders. As a direct consequence of Lyft's actions, Plaintiff and other Lyft users were unable to protect themselves from harassment or attack and had little information about the strangers Lyft hired to transport them in their vehicles.

129.   Lyft does not disclose its policies or procedures on dealing with sexual assault by its drivers. Lyft does not properly train its customer service representatives on how to deal with serious allegations of driver misconduct. As a result, passengers who report sexual abuse by a driver have been later matched with the same driver, and dangerous drivers continue to drive with Lyft and assault passengers while Lyft profits from their actions. At the time of Plaintiffs' attacks, Lyft's guidelines for their drivers made no mention of sexual harassment or assault guidelines.

130.   Moreover, even when Lyft is notified of an attack, it routinely fails to offer any meaningful redress. For instance, at the times relevant to Plaintiff's claims:

a.   Lyft did not encourage (and in fact sometimes actively dissuaded) drivers and riders from seeking legal redress against their assailants.

b. Lyft failed to readily cooperate with law enforcement investigating claims of sexual assault and harassment absent a warrant, court order, or subpoena.

c. Numerous assault victims were given no reassurance their assailant would be removed from the platform and in some instances, Lyft wholly ignored the complaint.

d. Lyft provided no mental-health support for its users who have been victims of attack or harassment.

131.    In short, Lyft fails to follow reasonable safety procedures and intentionally induces passengers to use Lyft's services while in a vulnerable state. As a result, Plaintiff, and women like her, are attacked, sexually harassed, assaulted, and raped by Lyft's drivers.

132.    Despite advertising to passengers that "Your safety is important" and "Safety is our top priority," Lyft makes clear that its main priority is profit, not passenger safety.

### THE ATTACK ON PLAINTIFF

133.    This suit arises from the serious harm Plaintiff suffered as a result of the wrongful acts and omissions of Defendants.

134.    On or about April 17, 2023, Plaintiff was volunteering at a golf tournament with her work associates. Plaintiff had been drinking and needed to leave prior to the dinner that followed the tournament. Plaintiff's friend ordered a Lyft to get Plaintiff home safely.

135.    During the ride, the Lyft driver forced Plaintiff to perform oral sex. Plaintiff recalls that she also vomited in the Lyft.

136.    After the tournament dinner ended, Plaintiff's friend returned to Plaintiff's house. Plaintiff and her friend had previously agreed she would stay the night due to the friend living too far away to drive late at night. When Plaintiff's friend arrived, she found the house was unlocked and Plaintiff was on the bathroom floor, topless and the bathroom faucet was running. Plaintiff

told her friend that the Lyft driver made Plaintiff perform oral sex prompting her friend to call an ambulance to take Plaintiff to the hospital to get checked out.

137.    At the hospital, a SANE exam and CT scan were performed.

138.    The suspect was arrested after he was identified by both Plaintiff and her friend as the perpetrator. DNA evidence (semen) linking the perpetrator to the assault was also found on the Plaintiff's clothing. The police investigation/prosecution is active and ongoing.

139.    Plaintiff is traumatized by this event, and it has severely impacted her daily life.

### DISCOVERY RULE AND FRAUDULENT CONCEALMENT

140.    The discovery rule applies to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence, should have known of the existence of her claim against Lyft.

141.    Plaintiff was not aware of the foreseeability of the assault she endured because Lyft intentionally concealed the fact that Lyft drivers had been regularly physically and/or sexually assaulting women and instead misrepresented that Lyft was a safe mode of transportation. Plaintiff had no way of knowing the inadequacy of Lyft's mechanisms to prevent sexual misconduct.

142.    A reasonable investigation by Plaintiff at the time of her assault would not have revealed the factual basis of her claims against Lyft. This is because Lyft, through marketing and more, took actions to conceal that its drivers regularly and frequently assaulted women. This is also because Lyft has publicly claimed that it does not control its drivers and that its drivers are not Lyft employees. As such, despite reasonable diligence, Plaintiff was unable to discover Lyft's negligent or wrongful conduct, which brought about or contributed to bringing about the assault she suffered.

143.    Furthermore, the running of any statute of limitations has been equitably tolled by reason of Lyft's intentional representations and fraudulent concealment and conduct.

144.    Through its affirmative misrepresentations and omissions, Lyft actively concealed from Plaintiff the true risks associated with using the Lyft App and riding in a Lyft, specifically, the risk of being assaulted, battered, harassed, and/or otherwise attacked.

145.    As a result of Lyft's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Lyft could be held liable for the risks its drivers posed and that those risks were the direct and proximate result of Lyft's acts and omissions.

146.    Plaintiff did not learn of Lyft's negligent or wrongful actions and omissions in bringing about the assault until after she saw advertisements for legal help and retained counsel on July 7, 2023.

147.    Furthermore, Lyft is estopped from relying on any statute of limitations because of its concealment of the truth about its failure to adequately employ measures to ensure the safety of its passengers. Lyft had a duty to disclose the true character, quality, and nature of its background checks and the incidence of Lyft drivers sexually assaulting or otherwise attacking passengers, because this was non-public information over which Defendants had, and continue to have, exclusive control, and because Defendants knew this information was not available to Plaintiff, Lyft passengers/customers, and/or the general public.

**CLAIM 1: NEGLIGENCE**
**(Including, Negligent Hiring, Retention, Supervision, and Entrustment)**

148.    Plaintiff incorporates all prior allegations.

149.    By providing transportation to the general public using its application and network of drivers, Lyft owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

1
2
3
4
5
6
7
8
9

    a.   The factors courts consider in assessing whether a defendant owes a duty of care all support finding a duty here: (1) Plaintiff's injuries were a foreseeable risk of Lyft's business model and practices; (2) Plaintiff's injuries are certain and compensable; (3) there is a close connection between Lyft's conduct and Plaintiff's injuries; (4) Lyft's conduct, relative to the but-for world where it acted reasonably, had no social utility; (5) Lyft is in the best position to modify its conduct to prevent future harm; (6) the burden to Lyft of upholding its duty is reasonable in light of the potential to avoid injuries; and (7) Lyft is in a strong position to insure or self-insure.[5]

10
11
12
13

    b.   Lyft owed a duty because it distributed and promoted its platform while on notice of acts of widespread sexual assault and harassment committed by its drivers against its passengers.

14
15

    c.   Lyft owed a duty because its prior conduct created a risk of harm to Plaintiff and caused her actual harm.[6]

16
17

    d.   Lyft owed a duty because the risk of harm to Plaintiff was embedded in, and an inherent component of, its negligent business practices.

18
19

    e.   Lyft owed a duty because it controlled the drivers.

20
21

    f.   Lyft owed a duty because it designed and controlled the transportation experience and environment for both drivers and passengers.

22
23
24

    g.   Lyft owed a duty because it voluntarily undertook to provide a safe ride to passengers, its failure to exercise case increased the risk of harm to passengers, and the harm was suffered because of passengers' reliance on Lyft's undertaking.[7]

25
26
27
28

---

[5] *See, e.g.*, *Rowland v. Christian*, 69 Cal. 2d 108 (1968).
[6] *See* Restatement (Second) of Torts §§ 321, 322.
[7] *See* Restatement (Second) of Torts §§ 323, 324A.

h. Lyft owed a duty because it offered and contracted to provide rides to the public, and this offer carried an implied warranty that it would provide rides safely.

i. Lyft owed a duty because it retained control over its drivers and exercised that retained control in a manner that affirmatively contributed to Plaintiff's injuries by making sexual assaults in Lyft vehicles dramatically more likely.[8]

j. Lyft owed a duty because it has a special relationship with its passengers:

    i. Lyft has a special relationship with its passengers since its passengers are in a relationship of vulnerability and dependence toward Lyft while they are summoning a ride, waiting for a ride, getting into a Lyft, riding with Lyft, and parting ways with the driver.

    ii. Lyft has a special relationship with its passengers since Lyft exercises control and has the ability to exercise control over the environment the passenger occupies. In Lyft's case, this environment also consists of an "online platform" which is a type of digital environment. Lyft is in a superior position relative to its riders to provide a safe (physical and technological) environment.

    iii. Lyft has a special relationship with its passengers since Lyft derives a special benefit from its passengers' dependence and reliance upon Lyft. Lyft makes a financial profit from this relationship.

    iv. Lyft has a special relationship with its passengers because it collects detailed data on their location and movements, and, on information and belief, utilizes that data for its own commercial purposes, including potentially selling the data to third parties.

---

[8] *See* Restatement (Second) of Torts § 414; *Sandoval v. Qualcomm Inc.*, 494 P.3d 487 (Cal. 2021).

v.    Lyft has a special relationship with its passengers because, based on its representations, undertakings, and business model, Lyft stood in the shoes of the drivers. Passengers pay Lyft, not the driver, and get a receipt from Lyft, not the driver. All communications about the experience come from Lyft. Passengers have no ability to identify or contact their driver outside of the channels controlled exclusively by Lyft.

vi.    The special relationship between Lyft and its passengers has defined boundaries since it exists specifically between Lyft and those individuals who use Lyft's application to request a ride, as opposed to all members of the public.

k.  Lyft owed a duty because it had a special relationship with its drivers and so was obligated to prevent them from harming passengers.[9]

l.  Lyft owed a duty as a common carrier to protect passengers. As a common carrier, Lyft owed a duty to use the utmost and highest care and vigilance, and to do all that human foresight, care, and vigilance can do to avoid harm to passengers.

m. Lyft owed a duty to prevent drivers from harming passengers because the drivers (1) were on Lyft's premises, (2) were using Lyft's product, and (3) Lyft knew or had reason to know it has the ability to control the drivers and of the necessity and opportunity for exercising such control.[10]

n.  Lyft owed a duty to prevent drivers from harming passengers, including from intentionally doing so, because (1) Lyft permits drivers to use its chattel—the Lyft product and trademarks, (2) Lyft was virtually present in the vehicles, and (3) Lyft

---

[9] *See id.*
[10] *See* Restatement (Second) of Torts § 317.

knew or had reason to know Lyft had the ability to control the drivers and of the necessity and opportunity for exercising such control.[11]

o. Lyft owed a duty because it took charge of drivers whom it knew or should have known were likely to cause bodily harm to others.[12]

p. Lyft owed a duty because it voluntarily took custody of passengers under circumstances such as to deprive them of their normal power of self-protection and subjected them to association with persons likely to cause them harm, and (1) knew or had reason to know Lyft had the ability to control the drivers and (2) knew or should have known the necessity and opportunity for exercising such control.[13] Lyft also owed this duty because passengers were helpless to adequately aid or protect themselves.[14]

150.    Plaintiff specifically includes claims based on negligent hiring, retention, and supervision. Under those theories, Lyft owed a duty to protect passengers from drivers because:[15]

a. Lyft hired the drivers;

b. Drivers were or became unfit to perform the work of driving for Lyft; and

c. Lyft knew or should have known that the drivers were or became unfit and that this unfitness created a particular risk to others.

151.    Lyft breached its duty to Plaintiff.

a. Lyft introduced a new form of transportation without taking any study of the evident risks or efforts to prevent them.

b. Lyft failed to adapt or improve its safety procedures.

_____

[11] *See* Restatement (Second) of Torts § 318.
[12] *See* Restatement (Second) of Torts § 319.
[13] *See* Restatement (Second) of Torts § 320.
[14] *See* Restatement (Second) of Torts § 324.
[15] *See, e.g.*, Restatement (Second) of Torts § 411.

c.  Lyft marketed its product as one that would provide safety for passengers, lulling passengers into a false sense of security, and making it seem like a good option for vulnerable riders late at night.

d.  Lyft failed to warn passengers of the risk of Lyft rides.

e.  Lyft failed to adequately vet prospective drivers.

    i.  When hiring new drivers, Lyft did not verify driver identities with biometric background checks. Lyft did not correct for false negatives created by its name-based screening procedures. Lyft did not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Lyft did not invest in continuous monitoring of its drivers and was not immediately alerted when one of its drivers was implicated in criminal acts.

    ii.  Lyft had no reasonable basis to believe Lyft drivers were fit to drive vulnerable riders, particularly at night, and failed to use reasonable care in determining whether any given driver was fit for the task.

    iii.  Lyft knew or should have known both that the drivers were unfit, and that the unfitness of a driver created an unreasonable risk of harm to Lyft's passengers.

f.  Lyft endorsed or recommended drivers to passengers without adequate basis for doing so.

g.  Lyft failed to create clear expectations and conduct training or otherwise exercise control over driver behavioral norms to make clear and effective that Lyft was not a means for drivers to seek personal relationships with passengers.

h.  Lyft failed to remove drivers from its platform who it knew posed a risk of sexual misconduct.

i.   Lyft failed to respond appropriately to reports of driver misconduct, including for years letting drivers remain on the system until they had two or more reports of misconduct.

j.   Lyft failed to establish and maintain an appropriate and robust system for receiving passenger complaints of sexual misconduct.

k.   Lyft made it difficult for passengers to report sexual assaults, failed to conduct root cause analyses, and chose not to investigate, understand, or adopt evidence-based prevention options.

l.   Lyft failed to provide technological tools to deter sexual assaults, including video monitoring.

m.   Lyft failed to provide alerts to law-enforcement when a driver veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period of time.

n.   Lyft failed to cooperate with police with its driver assaulted passengers. Lyft refused to release driver information to law enforcement absent a subpoena, discouraging police and prosecutors from investigating and prosecuting Lyft drivers and providing Lyft drivers with assurance that their illegal behavior will go unpunished.

o.   Lyft failed to use the utmost care and vigilance to protect Plaintiff from its own driver who assaulted, harassed, or otherwise attacked Plaintiff while she was being transported by Lyft.

p.   Lyft failed to take reasonable precautions to protect its vulnerable female riders and other passengers, including Plaintiff, from the foreseeable and known risk of assault or harassment by its drivers. If Lyft had used the highest degree of care, Lyft could

1    have prevented or reduced the likelihood of the sexual assault of its passengers,

2    including Plaintiff.

3    152.    As a proximate result of Lyft's negligence, Plaintiff was assaulted or harrassed by

4

5    the Lyft driver and suffered psychological and physical harm.

6    153.    As a proximate result of Lyft's negligence, Plaintiff suffered economic and

7    noneconomic damages.

8                            **CLAIM 2: MISREPRESENTATION**

9    154.    Plaintiff    pleads    claims    for    both    affirmative    misrepresentation    and

10   misrepresentation by omission.

11   155.    Lyft represented to Plaintiff and the general public that safety was Lyft's priority,

12

13   and that Lyft's goal was to provide a safe ride. At the same time, Lyft already knew that a number

14   of its drivers had preyed on vulnerable female passengers by sexually molesting, assaulting,

15   harassing, and/or raping them.

16   156.    Lyft made these representations to induce women, like Plaintiff, to use Lyft's

17   services and to derive profit from women like Plaintiff.

18
19   157.    Lyft made intentional misrepresentations of fact to all users of the Lyft App.

20   158.    These statements were false when made.

21   159.    Lyft failed to disclose the truth that Lyft prioritized growth and driver supply over

22   passenger safety.

23   160.    Lyft failed to disclose the truth that Lyft failed to adequately protect passengers

24   against sexual assault or harassment committed by drivers.

25   161.    Lyft had a duty to disclose the truth of its priorities and lack of adequate safety

26
27   mechanisms.

28

CASE NO. 3:24-cv-00799-AMO            33        PLAINTIFF'S FIRST AMENDED
                                                COMPLAINT AND JURY DEMAND

a. Lyft had a duty to disclose because, as alleged above, it had a special relationship with the passengers.

b. Lyft had a duty to disclose because it had a special relationship with the drivers.

c. Lyft had a duty to disclosure because of its exclusive, superior knowledge.

d. Lyft had a duty to disclose due to its active concealment of the safety conditions of Lyft rides.

e. Lyft had a duty to disclose because of the dangerous conditions of the Lyft product.

f. Lyft had a duty to disclose because Lyft made affirmative incomplete misrepresentations with knowledge of undisclosed facts that materially qualified the facts disclosed or rendered the disclosed facts likely to mislead.

162.    These representations and omissions regarding safety were made to Lyft customers through various channels, including but not limited to: retail advertising, emails, social media, and Lyft's own website, app store product placement, and Lyft App.

163.    While the wording of different communications and advertising varied, Lyft's messaging consistently presented and reinforced a unique selling proposition of a safe ride.

164.    Lyft intended that its marketing proposition reach the widest possible audience, including every passenger, and especially including women and other vulnerable riders.

165.    Lyft intended that every passenger rely on its safety marketing. Plaintiff relied upon several advertisements and statements where Lyft proclaimed it would provide a safe ride.

166.    Regardless of Lyft's intent, it can be presumed that every Lyft passenger, especially a vulnerable female passenger, assumes Lyft is doing everything it can to provide a safe ride and relies on that assumption in deciding to use Lyft's product.

167.    In entering a Lyft vehicle, Plaintiff reasonably relied on Lyft's representations that it would get her safely to her destination.

168.    In trusting and relying on Lyft's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by the Lyft driver who repeatedly raped Plaintiff.

169.    As a result of relying on Lyft's misrepresentations and omissions, Plaintiff was assaulted or harassed by a Lyft driver and suffered economic and non-economic damages.

## CLAIM 3: NEGLIGENT FAILURE TO WARN

170.    Plaintiff incorporates all prior allegations pleaded under the Negligence claim.

171.    Lyft's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

172.    In operating its business, Lyft knew and had reason to know that its passengers were at risk of sexual assault and abuse by Lyft's drivers since at least 2015. Since then, Lyft has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Lyft's passengers by Lyft's drivers.

173.    Despite the knowledge of the danger its enterprise creates, Lyft did not alert its passengers, including Plaintiffs, to the risk of sexual harassment and assault by Lyft Drivers. In fact, Lyft continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers.

174.    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The

insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's Drivers

175.    Lyft itself represented to its passengers that riding with Lyft is safe, implying it is free of risk from physical and/or sexual assault.

176.    Lyft did not warn that its criminal background checks of Lyft drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Lyft even after a passenger reports to Lyft that she was physically and/or sexually assaulted.

177.    Lyft had reason to know that passengers would be unaware of the risk of physical and/or sexual assault by Lyft drivers.

178.    A warning to its passengers that they were at risk of physical and/or sexual assault by Lyft drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Lyft drivers.

179.    Plaintiff would not have ridden alone in a Lyft had Lyft provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by an Lyft driver.

180.    As a legal and proximate result of Lyft's actions and omissions, Plaintiff was raped by the Lyft Driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

181.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

///

1

**CLAIM 4: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

2

182.    Plaintiff incorporates all allegations pleaded under the Negligence claim.

3

4

183.    Each of the asserted duties owed by Lyft included the duty to exercise reasonable

5

care to avoid causing Plaintiff emotional distress.

6

184.    In particular, Lyft owed a duty because it had a special relationship with its

7

passengers.

8

185.    Lyft also owed a duty because it should have realized that its conduct involved an

9

unreasonable risk of causing emotional distress and, from facts known to it, should have realized

10

that the distress might result in illness or bodily harm.[16]

11

186.    As a proximate result of Lyft's negligence, Plaintiff was assaulted by a Lyft driver

12

and suffered severe emotional distress.

13

**CLAIM 5: COMMON CARRIER'S NON-DELEGABLE DUTY
TO PROVIDE SAFE TRANSPORTATION**

14

15

187.    This claim includes Lyft's direct liability for each breach of the duty to provide

16

safe transportation, whether acts constituting the breach were committed by Lyft or by its drivers.

17

188.    At the time Plaintiff was sexually assaulted, Lyft was a common carrier because it

18

19

was, and held itself out to the public as, a business that undertook (whether directly or indirectly)

20

to transport passengers by motor vehicle, and did in fact provide transportation by motor vehicle,

21

offering these services to the general public indiscriminately and in exchange for compensation.

22

189.    Through a digital application made available to the general public, Lyft connects

23

passengers with its transportation network drivers to provide them with transportation, from place

24

25

to place, for profit.

26

190.    Lyft charges standard fees for its services through its application.

27

28

————————————————

[16] *See* Restatement (Second) of Torts § 313.

191.    Lyft represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Lyft's transportation services.

192.    As a common carrier, Lyft owes its passengers a heightened duty of care. Lyft owes a duty to employ the utmost degree of care, skill, judgment, and diligence that would be expected of a very cautious company. And Lyft has a duty to do all that care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff. Lyft also owes a duty to keep its passengers safe from misconduct (including any sexual misconduct) during its rides, especially from its participating drivers.

193.    As a common carrier, Lyft has an implied contract with its passengers to carry them safely to their destination and to protect them against sexual misconduct during that carriage.

194.    As a common carrier, Lyft has a non-delegable duty to protect its passengers against harm including sexual assault.

195.    A common carrier may contract out the performance of its non-delegable duty but may not contract out its ultimate legal responsibility. Thus, although Lyft may transfer the task of transporting its passengers to a contractor, it may not thereby shift its duty to transport its passengers safely.

196.    When Lyft's driver engaged in sexual misconduct toward Plaintiff, this was a breach of Lyft's non-delegable duty, as a common carrier, to safely transport Plaintiff.

197.    When Lyft's driver engaged in sexual misconduct toward Plaintiff, this was a breach of Lyft's implied warranty of safe carriage.

198.    When Lyft's driver engaged in sexual misconduct toward Plaintiff, this meant that Lyft had failed in its duty to keep Plaintiff safe and protect her against sexual misconduct.

199.    As a legal and proximate result of Lyft's actions and omissions, Plaintiff was assaulted, battered, harassed, or otherwise attacked by the Lyft Driver, which humiliated, degraded, violated, and robbed Plaintiff of her sense of dignity and personal safety. The attacks on Plaintiff caused Plaintiff to suffer physical or psychological harm.

200.    As a direct and proximate result of Lyft's breach of its duty of care as a common carrier, Plaintiff suffered economic and non-economic damages.

### CLAIM 6: OTHER NON-DELEGABLE DUTIES TO PROVIDE SAFE TRANSPORTATION

201.    This claim includes liability for each breach of Lyft's non-delegable duty to provide safe transportation, whether acts constituting the breach were committed by Lyft or by its drivers.

202.    Lyft's non-delegable duties are grounded on two independent bases: (1) its own representations to the public, voluntarily undertaking to provide safe transportation; and (2) the nature of its business.

203.    Lyft holds itself out to the public as providing safe transportation. Riders reasonably believe that, when they request a Lyft, they are receiving transportation from Lyft. Thus, Lyft has a non-delegable duty to supply safe transportation, just as if Lyft were supplying that transportation itself, whether or not it in fact engages independent contractors to provide that transportation.[17]

204.    Lyft, by transporting persons, including intoxicated persons, in an isolated setting in private vehicles driven by random individuals unknown to Lyft, was engaged in work involving a special danger of sexual misconduct, which Lyft knew or should have known was inherent in the transportation business it operated, and which Lyft should have contemplated when agreeing

---

[17] Restatement (Second) of Torts § 429.

to transport passengers. Thus, Lyft has a non-delegable duty to protect passengers against the danger of sexual misconduct, and Lyft is liable for the failure of its drivers to protect against this danger, and for their active and intentional breach of Lyft's duty of protection.[18]

205.    Lyft, by transporting persons, including intoxicated persons, in an isolated setting in private vehicles driven by random individuals unknown to Lyft, was engaged in an abnormally dangerous activity. Lyft knew or should have known that this was an abnormally dangerous activity. Thus, Lyft has a non-delegable duty to protect its passengers against the dangers of such transportation, including sexual assault. Lyft is thus subject to liability to the same extent as a driver is for physical harm caused by sexual assault during transportation.[19]

206.    Lyft, which transports persons for profit in private vehicles, was and is engaged in a type of activity that Lyft should have known would likely create a peculiar risk of physical harm to others in the absence of special precautions. As such, Lyft owed to its passengers a nondelegable duty to see that its drivers used such precautions.[20]

207.    Lyft has been granted state and local authority (in the form of licenses, franchises, and charters) to do business as a transportation network company, and it can only carry out its business and offer transportation services pursuant to this authority. By regulation, it can only carry out its transportation business under its proprietary LYFT trademark. Lyft's drivers are non-professional drivers who cannot lawfully offer transportation services except under the grant of authority to Lyft and using Lyft's trademark. Lyft's transportation business carries an unreasonable risk of harm to others. As such, Lyft owes passengers a non-delegable duty and is

---

[18] Restatement (Second) of Torts § 427 (Negligence as to Danger Inherent in the Work).
[19] Restatement (Second) of Torts § 427A (Work Involving Abnormally Dangerous Activity).
[20] Restatement (Second) of Torts § 416 (Work Dangerous in Absence of Special Precautions).

subject to liability for physical harm caused to others by the negligence of drivers who operate under the authority granted to Lyft and use Lyft's trademark.[21]

208.    Lyft, which offers transportation to the public and creates a public digital environment for that purpose, was engaged in work that unless carefully done involved a risk of making this environment unsafe for use by members of the public. As such, Lyft owed a nondelegable duty to keep its transportation environment safe for riders' use.[22]

209.    Statutes and regulations require that Lyft use specific safeguards and precautions for the safety of its passengers. As such, Lyft owed to its passengers a non-delegable duty to provide those safeguards and precautions.[23]

210.    Lyft was and is engaged in transportation activities that are illegal unless licensed. As such, Lyft owed to its passengers a non-delegable duty to see that due care was used in their protection.

211.    Lyft contracts with passengers to provide them with rides, and its drivers carry Lyft's passengers pursuant to the contract between Lyft and the passenger. As such, Lyft owed to its passengers a non-delegable duty to see that due care was used in their protection.

212.    Lyft owed its passengers a non-delegable duty to see that due care was used in their protection, including in protecting them against sexual assaults. This was the type of duty that, even if Lyft contracted its performance to an agent, employee, or third party, Lyft would be subject to liability for the failure of such agent, employee, or third party to perform the duty.[24]

213.    A business that has a non-delegable duty may contract out the performance of the non-delegable duty but may not contract out its ultimate legal responsibility. Thus, although Lyft

_____

[21] Restatement (Second) of Torts § 428 (Contractor's Negligence in Doing Work Which Cannot Lawfully be Done Except Under a Franchise Granted to His Employer).
[22] Restatement (Second) of Torts § 417 (Work Done in a Public Place).
[23] Restatement (Second) of Torts § 424 (Precautions Required by Statute or Regulation).
[24] Restatement (Second) of Agency § 214.

may transfer the task of transporting its passengers to a contractor, it may not thereby shift its duty to transport its passengers safely.

214. Lyft failed to safely transport Plaintiff.

215. As a legal and proximate result of the breach of Lyft's non-delegable duty to safely transport its passengers and protect them from sexual assault, Plaintiff was assaulted, battered, harassed, or otherwise attacked by a Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her sense of dignity and personal safety. The attack on Plaintiff caused Plaintiff to suffer physical or psychological harm.

216. As a direct and proximate result of Lyft's breach of its non-delegable duties, Plaintiff suffered economic and non-economic damages.

## CLAIM 7: VICARIOUS LIABILITY FOR LYFT DRIVER'S TORTS
### (Employee, Retained Control, Apparent Agency, Ratification, California Public Utilities Code)

217. Lyft is vicariously liable for the negligence and intentional torts—including but not limited to assault, battery, rape, false imprisonment, and intentional infliction of emotional distress—committed by the Lyft Driver who assaulted Plaintiff.

### a. Employee

218. Under the doctrine of *respondeat superior*, Lyft is responsible for the torts of its employees committed within the scope of employment, connected with acts otherwise within the scope of employment, in furtherance of Lyft's business, necessary to accomplish the purpose of employment or authorized by Lyft. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiffs.

219. Lyft profits from transporting vulnerable passengers. Lyft encourages female passengers to use its services. At the same time, Lyft does not take reasonable steps to protect its

passengers or warn them of the dangers of riding with Lyft. Lyft should bear the costs of injuries that result from torts such as assault and harassment, rather than the victims of Lyft's negligence, willful wrongdoing, and intentional omissions made at the expense of passenger safety.

220.    Lyft drivers are employees and agents of Lyft. Lyft reserves the right to control the activities of Lyft drivers. Lyft controls the prices charged to customers, controls contact with the customer base, controls the ability of drivers to see where they will be driving before they accept a ride, and reserves the right to terminate drivers with or without cause.

221.    Lyft retains and in fact exercises overwhelming control over its drivers.

a. Lyft controls the App which all drivers must use to receive, accept, and complete rides with passengers.

b. Lyft sets the fare prices, including additional fees and costs imposed on the passenger, any opportunity for bonus and incentive payments to the driver, and any promotional offers or discounts for the passenger.

c. Lyft retains control over primary passenger contact and full control over the passenger's contact information via the App.

d. Lyft monitors the driver's route and determines fees and costs for any modification or cancellations, including provisions related to driver deviations or delays (which may result in modified charges and notices to the passenger), and instructing drivers on where to pick up and drop off passengers in relation to their destination.

e. Lyft retains the right to terminate drivers at will and impose disciplinary actions if drivers fail to comply with Lyft's rules.

f. Lyft imposes a code of conduct on drivers, including requiring drivers to dress professionally and limiting the number of times a driver may contact a passenger.

g. Lyft instructs drivers on how to maintain and operate their vehicle during a Lyft ride.

h.  Lyft maintains the driver rating system, which displays the average star rating for each driver.

i.  Lyft maintains customer service support where customers can report driver-related complaints.

j.  Lyft drivers do not require any specialized skills or training.

k.  Lyft drivers' job duties of driving passengers to and from destinations is the essential core of Lyft's business.

l.  The assault Plaintiff suffered was perpetrated by the Lyft driver within the scope of his employment and authority. The assault or harassment of intoxicated and unaccompanied women or other vulnerable individuals who have been placed in an improperly screened Lyft drivers' car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

222.   The Lyft Driver's torts occurred within the scope of his employment.

a.  The conduct took place during, or was precipitated by, a Lyft trip.

b.  The conduct directly grew out of and was aided by the employment.

c.  The conduct was accomplished using the instrumentalities of the employment.

d.  The conduct was not unexpected but, instead, a predictable risk created by the employment.

e.  The conduct arose out of a core and indispensable part of Lyft's employment arrangement and requirements: the driver's mandate and ability to restrict passengers' freedom of movement.

f.  The conduct was motivated, at least in part, by a purpose to serve the employer, because the conduct included luring a rider into the vehicle and confining her there.

g. The Lyft Driver was able to initiate contact with Plaintiff and obtain her location through the Lyft app, which was only accessible to the Lyft Drivers through his employment with Lyft.

h. The Lyft Driver lured Plaintiff into his vehicle using his status as screened and trusted Lyft driver, and Plaintiff engaged in the ride under the mistaken belief that Lyft had properly screened and supervised its driver.

i. The Lyft Driver's employment with Lyft placed him in a position of power over Plaintiff, and he leveraged his status as a Lyft driver to further the assault.

j. Lyft passengers are placed in highly vulnerable positions. Passengers are in close proximity to drivers without the ability to control their surroundings or escape from the physical confines of drivers' vehicles. Passengers relinquish their autonomy and the control over their own safety and well-being to Lyft drivers, who Lyft represents as screened, safe, and trusted. This vulnerability is exacerbated for intoxicated passengers, like Plaintiff, to whom Lyft specifically markets. The power imbalance created by the driver-passenger relationship and Lyft's representations to passengers create the risk of abuse.

k. Sexual assaults are further predictable because, for over a decade, Lyft has known that drivers were sexually assaulting passengers.

l. Plaintiff's assault was neither unusual nor unforeseeable, such that it would be unfair to include resulting losses from the costs of Lyft's business. Thus, holding Lyft liable would promote the public interest and policy goals of preventing future sexual assault injuries and assuring compensation to victims.

m. Policy rationales underlying vicarious liability indicate the assault occurred within the scope of employment, in that Lyft's business model was solely the provision of

passenger transportation and, but for that transportation and the reliance on Lyft's reputation and safety, Plaintiff would not have engaged with and gotten into the cars of the Lyft Driver.

223.    Any requirement that a tort be committed within the scope of employment does not apply because Lyft is a common carrier or because the drivers' torts were a breach of Lyft's non-delegable duties other than those that arise from its status as a common carrier.

**b. Apparent Agency**

224.    Lyft is vicariously liable for the acts of its driver under the theory of apparent agency.

225.    Lyft, through its words and conduct, represented that the Lyft Driver was its agent or employee and that he had the authority to, on Lyft's behalf, provide safe transportation.

226.    Lyft passengers, including Plaintiff, look at the Lyft institution rather than its individual drivers to provide transportation services, and Lyft holds these drivers out to passengers as agents of Lyft.

227.    Lyft drivers display the Lyft logo when interacting with passengers, and in many cases Lyft drivers are the only people at the company with whom Lyft's passengers ever have direct contact. Lyft drivers provide the service that Lyft claims to provide—safe transportation.

228.    By allowing Lyft drivers to represent Lyft's business, Lyft creates the impression that its drivers, including the Lyft driver at issue here, were Lyft's employees or agents. Lyft holds its drivers to third parties, including passengers and Plaintiff, as having authority to act on behalf of Lyft, or causes third parties, including passengers and Plaintiff, to reasonably believe that Lyft drivers have authority as agents or employees of Lyft.

229.    Given Lyft's representations and undertaking, Lyft is estopped from maintaining now that passenger safety was the responsibility of the Lyft Drivers, and that Lyft has no

connection with nor accountability for Plaintiff, who it delivered into the hands of the predator driver.

230.    Plaintiff justifiably relied on Lyft's express and implied representations to her detriment, i.e., she entered a vehicle with a Lyft driver believing that the Lyft driver was an employee or agent of Lyft, and that Lyft had adequately screened, supervised, and retained the driver.

231.    Lyft's words and conduct leading to the appearance of agency for the Lyft Drivers include but are not limited to:

a.  Lyft requires that all Lyft rides be initiated, modified, and cancelled through the Lyft App.

b.  Lyft requires Lyft drivers to have a Lyft logo prominently displayed in the vehicle.

c.  Lyft maintains control of all payments, communications, and complaints regarding the Lyft ride.

d.  At no point during the request for, course, or completion of a ride does Lyft disavow an employee/agent relationship with the Lyft driver.

e.  Lyft requires all passengers who wish to engage with an Lyft driver to agree to the Lyft terms of service.

f.  The scope of the apparent agency extends to any failure on the part of the driver to provide safe transportation, including intentional acts of sexual misconduct.

**c.  Ratification**

232.    Lyft is vicariously liable for the acts of its drivers under the theory of ratification.

233.    As alleged above, despite being aware of the scope and scale of sexual assaults perpetrated by Lyft drivers throughout the United States, Lyft intentionally normalized

hitchhiking, falsely marketed its rides as safe, and repeatedly failed to take adequate measures to redress the issue.

234.    Among other acts and omissions, Lyft failed to respond adequately to reports of sexual misconduct, failed to adequately investigate reports of sexual misconduct, failed to report sexual misconduct to law enforcement, and reinstated drivers after complaints of sexual misconduct.

235.    Lyft's conduct amounts to ratification of the torts committed by the drivers.

### d. California Public Utilities Code § 5354

236.    Lyft is vicariously liable for the acts of its drivers by statute.

237.    Lyft is a transportation network company subject to California Public Utilities Code § 5354.

238.    Section 5354 provides, in relevant part, that that the "act, omission, or failure of any . . . person offering to afford the authorized service [transportation] with the approval or consent of the permit or certificate holder [Lyft] is the act, omission, or failure of the permit or certificate holder [Lyft]."

239.    Lyft drivers are persons offering to afford the transportation service with the approval and consent of Lyft.

240.    Lyft was, at all relevant times, a permit or certificate holder subject to § 5354.

### CLAIM 8: BREACH OF CONTRACT

241.    Plaintiff entered a contract with Lyft. The essence of this commercial transaction was the payment of a fee to Lyft in exchange for safe and reasonable transportation to Plaintiff's destination.

242.    As a result of the conduct, acts, and omissions set forth above, Lyft breached its contract with Plaintiff, including breaching implied covenants inherent in such a contract.

243.    As a direct and proximate result of Lyft's breach of contract, Plaintiff suffered economic and non-economic damages.

## CLAIM 9: STRICT PRODUCT LIABILITY
## (FAILURE TO WARN AND DESIGN DEFECT)

244.    Lyft manufactures, designs, sells, markets, advertises, labels, and makes available in the stream of commerce the Lyft App, which is a self-contained computer program or software package that runs inside of an operating system.

245.    Users or consumers download the Lyft App from a distribution source, such as the Apple Store. Users may download either (or both) the passenger version of the Lyft App or the driver version of the Lyft App. Regardless of which "version" of the Lyft App a person purchases, downloads, or uses, it is connected to the same backend technology infrastructure that includes, but is not limited to, Lyft's algorithms, data, and physical hardware. The passenger version of the Lyft App, driver version of the Lyft App, and Lyft's backend technology infrastructure "communicate" and work together to facilitate the exchange of data, "match" passengers and drivers using different versions of the app, transmit payments, obtain and store "ratings" for drivers and passengers, and perform other functionalities as developed, implemented, updated, modified, or controlled by Lyft.

246.    When end users or consumers download the driver or passenger version of the Lyft App onto their mobile devices, they download a computer program or software package which then must be installed on their mobile device, in much the same way that individuals who purchase the Microsoft Office software package either download the software to install it or install it off of a disk onto their computers.

247.    When end users or consumers who have installed the Lyft App on their mobile devices open the Lyft App, they are interacting with the user interface on the "frontend." The frontend includes visual elements (for example, buttons, check boxes, and text in natural

language). The frontend or user interface is what allows end consumers to actually interact with the Lyft application and to make financial transactions through it. That is, this is the point of human-computer interaction. Each and every feature that end users or consumers interact with on the front end is directly and necessarily controlled by Lyft's physical servers (its backend technology infrastructure and technical specifications). The backend infrastructure is what actually makes the Lyft App work and has, at all relevant times, included identifiable, tangible elements, including but not limited to physical servers located at data centers around the country.

248.    Every feature of the Lyft App was designed, developed, implemented, and controlled exclusively by Lyft.

249.    Unlike social media platforms, the Lyft App does not consist of user-controlled content.

250.    The features and functionality of the Lyft App, including but not limited to all aspects of the user interface and all subsurface algorithms and coding, were designed, developed, implemented, coded, and controlled by Lyft.

251.    Lyft makes all decisions regarding the technical specifications and design of the Lyft App, including but not limited to the user interface and subsurface algorithms and coding that operate as part of Lyft's backend infrastructure.

252.    Lyft controls who, when, and how the Lyft App is used and exercises this control through the features and functionalities of the app which were designed, developed, coded, and implemented by Lyft.

253.    For example, Lyft is in complete control of which drivers get matched with which passengers and whether passengers and drivers may use the app.

254.    Lyft also has complete control over the text of all communications sent to drivers or passengers who contact Lyft for support of any kind.

255.    Lyft also sets rates which are charged for each ride and further sets the amount drivers earn for each ride.

256.    Lyft retains complete control over modifications, updates, and bug fixes to the code or algorithm that are released for the Lyft App. As with traditional software packages, end users or consumers must download and install updates to the Lyft App software when they are released.

257.    Lyft made design, guarding, and warning choices which have affected the experience of end users of the Lyft App by developing, updating, or modifying its technology infrastructure to develop, update, or modify the Lyft App or features of the Lyft App that are available to end consumers, including Plaintiffs on the user interface. Specifically, Lyft has controlled what features, including buttons, information sharing, or camera usage, are involved in the end user experience of the Lyft app.

258.    Lyft controlled the user experience for end users of the Lyft App (both drivers and passengers), by developing, updating, and modifying its technology infrastructure on the backend, to develop, update, or modify the Lyft App and or features of the Lyft App that are available to end consumers, including Plaintiffs, on the user interface. Specifically, Lyft has controlled what features, including buttons, choices, information sharing, or camera usage, are involved in the end user experience of the Lyft app.

259.    Lyft made decisions about and controlled all text that appears when end users access the Lyft App or Lyft website, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Lyft App and or website. Specifically, Lyft made decisions about what statements, representations, or warnings, if any, would appear in natural language on the frontend of the Lyft App or Lyft website that end consumers, including Plaintiffs, interact with.

260.     Lyft made decisions concerning the use of its algorithms, which on information and belief it considers proprietary to it, and which it developed using programming language. Lyft's algorithms operate on the backend of Lyft's technology infrastructure and utilize data to "match" riders and drivers. Lyft has been responsible at all times for the development, updating, and modification of its algorithm, which directly affects or affected the experience of end users, including Plaintiffs, interacting with the Lyft app.

261.     Lyft made design choices that defined the experience of end users of the Lyft app, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Lyft App and or features of the Lyft App that control the use and experience of end users including riders and drivers. This includes but is not limited to features related to Lyft's "rating" system by which users, at the completion of the ride interact with the Lyft App interface to select a rating from one to five stars for the rider or driver and the reporting system, by which users can use their keyboards to submit complaints or reports to Lyft in natural language. This data is then transmitted to Lyft's servers at various locations and used, among other things, for future matching purposes.

262.     Lyft facilitated the exchange of data and information between the user interface of the driver or rider versions of the Lyft App and its backend technology infrastructure.

263.     As the designer of a product, Lyft had the duty to conduct a hazard analysis to identify risks associated with its product and then to mitigate those risks in accordance with industry standards for severity and frequency, among other things.

264.     Specifically, as the designer of a product, Lyft had a duty to control for risks in accordance with the design hierarchy by (1) designing away the risks; (2) guard against any risks that cannot be designed out; and (3) warn against any risks that could not be designed away or guarded against.

265.    Lyft did not conduct an adequate hazard analysis and did not adequately control for risks associated with its product.

266.    It was reasonably foreseeable to Lyft, as the designer of the Lyft App, that end users or consumers were at risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Lyft app.

267.    However, Lyft failed to design away the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Lyft app.

268.    Lyft has publicly acknowledged that thousands of passengers and drivers have been sexually assaulted or harassed while using the Lyft app.

269.    As discussed above, the exact number of sexual assaults is unknown due to underreporting and Lyft's failure to disclose the true number of sexual assaults reported to it.

270.    Lyft also failed to mitigate the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Lyft app.

271.    Specifically, Lyft failed to design away the risks associated with using its app by, among other things, failing to provide and require the installation of dash cameras in each vehicle used by drivers and failing to provide other audio or video monitoring of rides.

272.    Lyft similarly failed to guard against the risk of risks of sexual harassment, assault, kidnapping, or other sexual misconduct by, among other things,

a.   Failing to design an effective safety-focused reporting system to capture safety data so it could be acted on;

b.   Failing to permit passengers to select drivers of the same gender;

c.   Failing to enact and appropriately enforce a zero tolerance policy toward drivers with a history of inappropriate behavior;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d.  Failing to appropriately monitor rides to detect known patterns of sexual assault, harassment, kidnapping or other forms of sexual assault, including but not limited to using existing GPS and predictive technology to monitor and respond to route deviations or drivers spending excessive time with passengers at the start or end of a route;

e.  Failing to offer timely support during unsafe rides; and

f.  Failing to add appropriate background checks before and after allowing drivers onto the app, including but not limited to biometric screening.

273.    Further, Lyft failed to provide adequate warnings to users of its app by failing to warn them to the actual risk of sexual harassment, assault, kidnapping, or other sexual misconduct.

274.    As a result, Lyft passengers were unable to make an informed decision about whether to use Lyft.

275.    Instead of warning users that they faced a risk of sexual misconduct, Lyft instead represented that it provided a safe ride and that safety was designed into its product. Thus, users did not know the true risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Lyft app.

**a.  Design Defect**

276.    At all relevant times, Lyft manufactured, designed, marketed, advertised, labeled, produced, sold, and made available in the stream of commerce the Lyft application.

277.    Customers, including Plaintiff, purchased or downloaded the Lyft application from app stores on their devices, including but not limited to the Apple Store or Google Play Store.

278.    The Lyft application was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff.

279.    Lyft was engaged in the business of manufacturing, designing, producing, marketing, advertising, labeling, selling, and making the Lyft application available to the public as a product in the stream of commerce.

280.    As the designer of the Lyft app, Lyft has superior knowledge and was in the best position to understand the risks and hazards associated with the product. The risks associated with using the Lyft application that form the subject of this Complaint were largely unknown to Lyft passengers, and Lyft passengers relied upon Lyft and its superior knowledge when they decided to use the Lyft application to obtain rides.

281.    The Lyft application was expected to and did reach the end users without substantial change in its condition. The end users were members of the public, including Plaintiff, who interacted with the interface of the Lyft application to obtain rides as passengers.

282.    The Lyft application was dangerous to an extent beyond that contemplated by the ordinary consumer who purchases or downloads it.

283.    The Lyft application created a risk of harm to persons that was not ordinarily expected by users or consumers, including Plaintiff. Specifically, users and consumers were at a risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct while using the Lyft App and the risk of this harm was not expected by the ordinary user or consumer of the Lyft application.

284.    The risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct against users or consumers was not reasonably foreseeable to the ordinary user or consumer, including Plaintiff.

285.    The ordinary user or consumer could not know the risk of sexual harassment, sexual assault, kidnapping, or sexual misconduct that users of the Lyft App face because, as set forth above, Lyft does not notify law enforcement when it receives reports of sexual harassment,

sexual assault, kidnapping, or other sexual misconduct involving the Lyft app; Lyft's own Safety Reports, published only for limited time periods, provide data on just five of twenty-one categories of sexual misconduct; and Lyft has, since its inception, marketed itself as the provider of a safe ride and as a company with adequate safety features for passengers, including Plaintiffs.

286.    The foreseeable risks of harm posed by the Lyft app, including sexual harassment, sexual assault, kidnapping, or other forms of sexual misconduct, could have been reduced or avoided by the adoption of a reasonably alternative design by Lyft, as set forth in the preceding paragraphs.

a. The Lyft App was designed to operate on smartphones which are equipped with cameras and microphones. Numerous other mobile applications interact with the smartphone's preexisting hardware to operate cameras or microphones in conjunction with use of the application (for example, Snapchat, Instagram). This technology is not only available, but widely used and could be adopted as part of Lyft's technology infrastructure. Alternatively, when individuals sign up to drive with Lyft, the driver version of the Lyft App includes a feature to have a camera shipped directly to the driver's home address; this same feature could be used to ship dash cameras to drivers.

b. The Lyft App included GPS tracking technology which is used to monitor the exact location of drivers and predict the time it takes them to reach their destination. Lyft also has safety alert features, but these features require affirmative action to be triggered by a user, which is often not possible in the context of sexual assaults or kidnapping. Lyft need only utilize its existing GPS, alert, and predictive technology to implement a feature whereby safety alerts are triggered in the event of route deviations or excessive time spent with a passenger at the beginning or end of a route.

c. The Lyft App was designed to operate on smartphones which are equipped with touchscreens. Various mobile applications, including, for example, password manager applications, utilize biometric features for security purposes. Additionally, many mobile phones use biometric features, including fingerprints or facial recognition, to unlock the phone. Thus, the technology to obtain biometric data from a driver's mobile phone itself—at minimal cost to Lyft—already exists and has been implemented in other contexts.

287.    Implementation of reasonable and feasible alternative designs would not impair the usefulness of the Lyft application or affect the cost to Lyft.

a. Lyft already tracks its drivers in order to match them with passengers and, during the duration of the route, as they transport passengers to ensure that drivers are taking the most efficient route. These steps are done to maximize Lyft's profits. Tracking drivers to ensure that they do not remain with passengers for excessive periods of time after the conclusion of a route or that they do not divert from a planned route with a passenger would better protect users and consumers while utilizing existing technology.

b. Lyft already employs a matching algorithm designed to connect passengers and drivers. The algorithm accounts for the distance between prospective passengers and drivers and whether the passenger has given the driver a one-star rating in the past. The addition of an option to allow female passengers to select female drivers would not require substantial modification of the existing algorithm.

c. The collection of biometric information on the driver version of the Lyft application would not impair its usefulness or add additional cost, because the application would function in much the same way with regard to the arrangement of rides. Additionally,

by using functionality already existing on smartphones, the additional cost, if any, would be minimal.

288.    The Lyft App was designed, maintained, and updated by large teams of data scientists, user experience researchers, and similar professionals and includes subsurface algorithms and systems and complex code. Many product features, including but not limited to the inner workings of Lyft's algorithms, are unobservable on the frontend. Discovery will reveal additional detail about the defects to the functionalities of the features of the product.

289.    As a proximate result of Lyft's acts and omissions, Plaintiff suffered both economic and non-economic damage.

**b. Failure to Warn**

290.    At all relevant times, Lyft manufactured, designed, produced, marketed, advertised, labeled, sold, and made available in the stream of commerce the Lyft application.

291.    Customers, including Plaintiff, purchased or downloaded the Lyft application from "app stores" on their devices, including but not limited to the Apple Store or Google Play Store.

292.    The Lyft application was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff.

293.    Lyft was engaged in the business of manufacturing, designing, producing, selling, and making the Lyft application available to the public as a product in the stream of commerce.

294.    The Lyft application was expected to and did reach the end users without substantial change in its condition. The end users were members of the public, including Plaintiff, who interacted with the interface of the Lyft application to obtain rides as passengers.

295.    Lyft had a duty to warn users and consumers, including Plaintiff, that using the Lyft App in the ordinary, customary, and reasonably foreseeable manner posed a danger to users and consumers. Specifically, Lyft had a duty to warn users and consumers that when using the

Lyft App or interacting with the Lyft App interface, users were in danger of sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

296.    Lyft had a duty to warn users and consumers that the features of the Lyft App posed a risk of harm to users and consumers, including Plaintiff, who used the Lyft App in a reasonably foreseeable manner. For example:

a.  Lyft had a duty to warn users including Plaintiff that the matching algorithm could pair passengers with drivers who had a criminal history; a history of receiving low- or no-star ratings from passengers; or a history of being the subject of reports or complaints from passengers.

b.  Lyft had a duty to warn users including Plaintiff that the GPS tracking and predictive features, including the exchange of data between the frontend of the user interface and the backend of Lyft's technology interface, did not include any feature to alert Lyft or law enforcement in the event that an Lyft driver deviated from the predicted or planned route or spent excessive time with a passenger at the beginning or end of a route.

c.  Lyft had a duty to warn users including Plaintiff that when interacting with the interface of the Lyft app, including the use of buttons and screens to order a ride, which in turn resulted in an exchange of information and data on the backend of Lyft's technology infrastructure, Lyft may transmit their location to individuals who posed a risk of harm, including sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

d.  Lyft had a duty to warn users and consumers including Plaintiff that they were at a risk of being sexually harassed, sexually assaulted, kidnapped, or subjected to other sexual misconduct when using the Lyft App or otherwise interacting with the user interface of the Lyft app.

297.    Lyft failed to provide any warning to the users and consumers of the Lyft app, including Plaintiff, regarding the risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct. In particular, Lyft failed to provide any warning of the risks, detailed in the preceding paragraphs, that users and consumers including Plaintiff faced while using the Lyft App or otherwise interacting with its user interface.

298.    To the extent Lyft can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was inadequate.

299.    To the extent Lyft can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was mitigated by Lyft's representations that Lyft prioritized the safety of users and consumers, including Plaintiff, designed safety into the user experience, and provided a safe ride.

300.    The breach of Lyft's duty to warn users and consumers of the risks detailed in the preceding paragraphs proximately caused Plaintiff's injuries.

301.    Specifically, because Lyft failed to warn Plaintiff that she was at risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct when using the Lyft App or interacting with the Lyft app's user interface, Plaintiff engaged a ride through the Lyft App and was sexually assaulted.

302.    Had Lyft warned users and consumers, including Plaintiff, of the risks detailed in the preceding paragraphs associated with use of the Lyft App and interaction with the Lyft user interface, Plaintiff would not have engaged a ride through the Lyft App.

303.    As a direct and proximate result of Lyft's failure to provide adequate warnings, Plaintiffs has suffered physical and emotional damages.

///

///

1
2

## CLAIM 10: VIOLATION OF UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code §V 17200 Et Seq.)

3

304.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair,

4

or fraudulent business acts or practices."

5

305.    Lyft's conduct was unlawful because it violated Lyft's common law duties of care.

6

306.    Lyft's conduct was unfair because it was unscrupulous, contrary to public policy,

7

and presented a serious risk of harm to persons Lyft was responsible for protecting.

8
9

307.    Lyft's conduct was fraudulent because it was grounded in Lyft's representations

10

that it would protect its passengers' safety.

11

308.    Lyft's conduct was grounded in unfair competition because the company enjoys a

12

competitive advantage by not adequately protecting its passengers.

13

309.    Plaintiffs have suffered injury in fact and have lost money or property as a result

14

of Lyft's unfair competition. Lost money or property includes money spent on rides falsely

15
16

promoted as safe and other economic damages.

17

310.    Lyft's conduct is ongoing.

18

311.    Plaintiffs seek appropriate injunctive relief to prevent future unfair competition.

19

### PUNITIVE DAMAGES

20

312.    Plaintiff incorporates all prior allegations.

21

313.    As stated above, Lyft knew that it faced an ongoing problem of sexual predators

22

driving for Lyft and assaulting its passengers. As early as 2014 Lyft knew that its drivers were

23

physically and sexually assaulting female passengers. Since 2014, Lyft has received frequent

24

passenger complaints about driver physical and sexual misconduct, including assault and rape, it

25

has been notified of police investigations of the criminal physical and sexual misconduct of

26

drivers acting within their capacity as Lyft drivers, and it has been the subject of numerous civil

27
28

suits and arbitrations alleging the sexual harassment and physical and/or sexual assault of Lyft's passengers by its drivers.

314.    Nevertheless, even though Lyft was fully aware of its sexual predator problem, it failed to take safety precautions to protect its passengers.

315.    Even after Lyft was aware some Lyft drivers were using driving for Lyft as an opportunity to get unsuspecting women into their vehicles and to physically or sexually assault them, Lyft and its officers made the conscious decision not to implement measures to thoroughly vet and monitor its drivers before and after hiring them.

316.    The decision not to implement more thorough and persistent background checks was driven by Lyft executives' desire for rapid expansion and increased profits, because the more drivers driving for Lyft, the more money there was to be made.

317.    Prioritizing profits over safety, Lyft and its executive officers also made the conscious decision not to warn its customers/users of the risk of being assaulted even after Lyft and its leadership were fully aware of this risk.

318.    Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Lyft drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of

customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Lyft drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, rape, and exploitation by Lyft's own drivers.

319.    Prioritizing profits over passenger safety, Lyft and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiff, and the public.

320.    As a direct and proximate result of the intentional, negligent, reckless, grossly negligent conduct of Lyft, Plaintiff was raped by the Lyft driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

321.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and/or psychological harm from which she may never fully recover.

322.    As a result of Lyft's misconduct as stated above, Plaintiff seeks punitive damages to punish Lyft for its misconduct and to deter future misconduct.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

- Entry of judgment on each of her claims against Defendants jointly and severally;

- Past and future economic and non-economic damages including physical pain, mental anguish, anxiety, medical expenses, lost earnings or earning capacity;

- Punitive damages;

- Pre- and post-judgment interest;

- The costs and expenses of litigation;

1

- Attorneys' fees;

2

- Equitable relief; and

3

4

- Such other relief as this Court may deem just and proper.

**JURY DEMAND**

5

Plaintiff demands a trial by jury on all issues so triable.

6

7

Dated: April 29, 2024                      Respectfully submitted,

8                                          By: */s/ Rachel Abrams*
                                           RACHEL ABRAMS (Cal Bar No. 209316)

9                                          ADAM B. WOLF (Cal Bar No. 215914)
                                           **Peiffer Wolf Carr Kane Conway & Wise, LLP**

10                                         555 Montgomery Street, Suite 820
                                           San Francisco, CA 94111

11                                         Telephone: 415.766.3544
                                           Facsimile: 415.840.9435

12                                         Email: rabrams@peifferwolf.com
                                                     awolf@peifferwolf.com

13

14                                         *Counsel for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 3:24-cv-00799-AMO          64          PLAINTIFF'S FIRST AMENDED
                                                COMPLAINT AND JURY DEMAND

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2024, I electronically transmitted the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of *Electronic* Filing to all CM/ECF registrants.

<u>*/s/ Rachel B. Abrams*</u>
Rachel B. Abrams